MASTERS (UNITED STATES v.). See Case No. 15,739.

## Case No. 9,267.

### The MASTERS.

### The RAYNOR.

[Brown's Adm. 342.] [1]

District Court, E. D. Michigan. July, 1871.

COLLISION — VESSEL AT ANCHOR — PROPER ANCHORAGE — ANCHOR WATCH.

In the absence of a law or custom prohibiting vessels from lying in a channel, anchorage there is not necessarily improper because the channel is narrow at that point, and vessels are constantly passing and repassing. if room be left for vessels and tows to pass in safety. In such an anchorage. however. a vigilant anchor watch is imperatively necessary.

[Cited in The Worthington and Davis, 19 Fed. 837; The Ogemaw, 32 Fed. 921.]

---

[1] [Reported by Hon. Henry B. Brown, District Judge. and here reprinted by permission.]

Libel for a collision between the bark Fame and the schooner Wm. Raynor.

On the 8th day of October, 1868, about seven o'clock in the evening, the bark Fame lay at anchor in the St. Clair river, a little below Port Huron, and just opposite the foot of the middle ground (so called), which is on the American side of the river. As she so lay at anchor, the tug I. U. Masters came down the river with a tow of four vessels, the fourth vessel in the tow being the schooner Wm. Raynor. The tug undertook to pass the bark on the American or port side of her, and between her and the said middle ground, and in doing so the schooner sagged off to port and came in collision with the bark's jibboom, carrying it away, and doing other damage. The current at this point is about four and a half miles an hour, and the wind was blowing quite strong, nearly down the river, but varying a little across the current from the American side. The bark was lying with her bows up stream, but the wind had swung her stern a little—not to exceed one point, and probably less—toward the Canadian side of the river. The course of the tug, in attempting to pass the bark as she did, was a little across the wind and the current, and the immediate cause of the collision was the tail of the tow being carried down against the bark by the wind and current.

W. A. Moore, for libellant, claimed: (1) That the bark lay bow up stream, with sails furled, light properly placed and burning, steady at anchor, and occupying not over 35 feet in width. (2) That the channel was from one-quarter to one-third of a mile wide, and not difficult of navigation. (3) That it is usual for vessels driven in by stress of weather to anchor in a channel of that width. (4) That two-thirds of the navigable channel lay on the starboard side of the bark. (5) That if she lay nearer the middle of the river, the tug had sufficient room to pass on the American side. (6) That, so far as the schooner was concerned, the accident was unavoidable, and the tug is responsible.

H. B. Brown, for the tug. A vessel colliding with another at anchor in a proper place is prima facie in fault, but if she be anchored in an improper place she cannot recover, unless the other vessel has grossly neglected her duty in passing her. Strout v. Foster, 1 How. [42 U. S.] 89; Knowlton v. Sanford, 32 Me. 148; The Marcia Tribon [Case No. 9,062]; O'Neil v. Sears [Id. 10,530]. The bark ought not to have anchored in the narrowest part of the channel, without some good reason, when there was plenty of room above and below. The bark was also in fault for not having a proper anchor watch. Buzzard v. The Petrel [Id. 2.261].

LONGYEAR, District Judge. There was no satisfactory proof before me as to the exact width of the river at the point in question, but it is near enough for the purposes of this case to assume, and such, I think, the proofs tend to show, that it is from one-fourth to one-half a mile wide. The proofs are contradictory as to the precise point where the bark lay in the river, varying from one-third of the distance from the American channel bank (the middle ground before spoken of) to the middle of the channel; but there is no dispute but that there was room on both sides of her for vessels and tows to pass, and that is sufficient for the purposes of this case.

The proofs show that the schooner was in no manner in fault for the collision, and the case against her was in effect abandoned at the hearing. The libel must therefore be dismissed as to her, and the case will be considered as against the tug alone.

Where a vessel at anchor is collided with by a vessel in motion, the latter is always prima facie in fault, provided the former is anchored in a proper place, and herself observes the law. In order to exonerate the tug from this prima facie liability, it is contended that the bark was anchored in an improper place—that the channel is narrow, and vessels and tows are constantly passing and repassing, and owing to a curve or bend in the river just above, and the strength of the current, the whole channel is needed for safe navigation, unobstructed by vessels lying at anchor. Many witnesses were sworn on both sides as to the safety and propriety of a vessel lying at anchor at the point in question, but I think their testimony may all be summed up in this: that there are safer places for vessels to lie at anchor, and where they would be a less obstruction to navigation, both above and below the place in question, and which the bark might have reached if she had chosen to do so. No law or custom was shown, however, prohibiting vessels from anchoring there, but, on the contrary, it appeared that others had anchored there, and the legal right to do so was conceded. It also appeared from the proofs that there was room on both sides the bark for vessels and tows to pass in safety, by the exercise of due care and diligence. I must hold therefore that the bark had a legal right to lie at anchor where she did. While so holding, however, I must also hold that, having selected a comparatively insecure and inconvenient place to lie at anchor, no matter whether from necessity or from choice, she was bound to exercise the greatest degree of care and diligence in keeping watch and ward for her own safety and the safety of passing vessels. A viligant anchor watch was essential under the circumstances, and the want of it would constitute a fault which could not be overlooked. Had the bark such a watch?

The only man on deck was Druillard, the pilot, and he was not there in the capacity of or on duty as a watch at all. In fact, the purpose for which he was there, as stated

by himself, shows that there was not only no watch as such, but that there was no pretense of any. He says, in substance, that he was there for the purpose of keeping himself warm by walking. It is true, when he accidentally, or otherwise, noticed the close proximity of the tow, he called the mate to put the wheel to port, but even this was not done in time to effect anything. If there had been a vigilant watch on board the bark, such as the circumstances in which she had voluntarily placed herself imperatively demanded, the danger would have been seen and the helm put to port, and thus by the force of the current the stern of the vessel would have been worked over against the wind, and the jibboom turned off to starboard in time, in all probability, to have cleared the schooner entirely, or, at all events, so nearly as to have much lessened the damages. If, in addition to this, the cable had been allowed to run out and the vessel to drop down the stream with the current, the collision would have been avoided with almost absolute certainty. Because the bark had not such a watch, and did not take any effective measures to avoid the collision, she must be held in fault. See 1 Pars. Shipp. & Adm. 576, 577, and cases cited in note upon p. 577.

But this does not exonerate the tug from inquiry into her conduct, or from responsibility, if she was also in fault. It is contended, on behalf of libellant, that the tug ought to have taken the Canadian side of the river, where there was more room, and where the wind and current would have carried the tow away from the bark, instead of bringing it directly down upon her. The excuse made on behalf of the tug for not taking the Canadian side is that there were other vessels within that space at the time, making it dangerous to take that side. I do not think that it appears by the proofs that the position of those other vessels was such as to make it any more dangerous to pass on that side than on the other. But, as we have seen, there was room to pass on either side, and the tug, no doubt, had the right to pass on either side which in the best judgment of her master was the most feasible under the circumstances as they appeared to him at the time. Having made his choice, however, and that choice involving, as it did, the necessity of crossing the wind and current, the inevitable effect of which was as apparent then as it was afterwards, it became the duty of the master of the tug to make due allowance for that effect. This, of course, he did not do, or the collision would not have occurred. See The New Philadelphia, 1 Black [66 U. S.] 76.

The tug is therefore held also in fault.

Both vessels being in fault, it follows that each must bear a moiety of the damages. A decree must be entered in favor of libellant against the tug for a moiety of his damages and costs, referring it to a commissioner to ascertain and report the damages, and dismissing the libel as against the schooner.